# MRS. ELIZA RICHARD *v.* GEORGE S. HOUGHTAILING.

### APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED SEPTEMBER 30, 1897.     DECIDED OCTOBER 14, 1897.

### JUDD, C.J., FREAR AND WHITING, JJ.

A conveyance of land held void when executed under the following circumstances. A young lady was brought up in the family of her guardian and treated as his daughter. The guardian assumed the trust, the property being subject to a mortgage to himself. He raised more money on the estate to pay off this mortgage and make improvements to increase its income. He took the mortgage over to himself, and after the ward had been of age three years, still living in his family and subject to his influence, procured from her to himself a deed of the property, not having presented his accounts as guardian to the Probate Judge for settlement and without informing his ward of their condition or the value of the property and not giving her opportunity for independent advice.

This is an appeal from a decree of Circuit Judge Carter adjudging a conveyance from plaintiff to defendant to be null and void and ordering a reconveyance. The uncontradicted facts are as follows: The plaintiff, Eliza, daughter of John Meek and Kaheleluli, was born on the 22d of July, 1875, and became of the legal age of eighteen on the 22d of July, 1893. Eliza went to defendant's home in 1884 when she was about nine years old and continued so to live until her marriage on October 29, 1896.

On the 13th December, 1886, John Meek and wife (Eliza's parents) executed a mortgage on land of his on Fort street and in Waikane, Koolaupoko, Oahu, to defendant Houghtailing for $1,700, to bear interest at 12% per annum. On the 15th December, 1886, two days after the mortgage, John Meek executed a deed to his daughter Eliza of the mortgaged estate, *i. e.*, land in Waikane, Royal Patent No. 158, and land in Fort street, Royal Patent No. 1,634, and on the same day Houghtailing was appointed guardian of the person and property of Eliza.

The guardian filed accounts at various times, the last one being for a period ending December 15, 1890, showing the principal of the $1,700 mortgage to be still due and $560.37 for interest to the date of hearing of the account, January 28, 1891. The guardian had obtained a license from the Probate Court to sell the Waikane land to pay off the mortgage, but for reasons that do not appear the land was not sold.

By a deed of one Wm. Hodge, Eliza was also entitled to a piece of land at Pawaa on King street, Honolulu, Royal Patent No. 7,185, the life tenant Webster having died in 1888. In January, 1891, Houghtailing obtained leave of the Probate Court to raise $4,200 on a mortgage with interest at 7% per annum on the three pieces of his ward's land in order to pay off the mortgage to himself of $2,260.37 and to expend the balance, $1,939.63, in the erection of cottages on the Pawaa land, expecting to increase the productiveness of the estate thereby and clear it of debt. These expectations have not been fulfilled. The guardian was ordered to report his proceedings to the Probate

Court, but he neglected to do this.    The mortgage was executed to Mrs. A. C. Howie on January 28, 1891, and interest was paid thereon for three years when it became in arrears.    On the mortgagee's agent pressing Houghtailing for interest he, being in funds, on the 10th July, 1895, paid off the mortgage, then amounting to $4,532.31 and took an assignment of it to himself. The ward had then been of legal age for about two years, but he did not consult her about the transaction.    On the ward's coming of age he did not present his final account to the Probate Court for approval, nor has he since, nor has he ever been discharged as guardian.    In June, 1896, Houghtailing employed a conveyancer to draft a deed of all the ward's property to himself in consideration of $1 and other "good and valuable considerations to her hereunto moving."    She was sent for, came to Houghtailing's town residence, signed the deed and her acknowledgment was taken by a notary.    Houghtailing had told the plaintiff that she owed him a lot of money and that to settle she better give him a deed of the lands.    Neither the condition of the account, the amount of the indebtedness nor the value of the land were stated to her.    She was not given an opportunity of taking disinterested advice nor was it suggested to her.    The next month after receiving the deed from Eliza, Houghtailing negotiated and executed a mortgage on the property for $4,500 and assigned his mortgage taken from Mrs. Howie (Crozier) to the mortgagee as "further security."    The mortgagee, before agreeing to lend his money on the strength of the deed, asked to see Eliza and she made affidavit on the 30th July, 1896, that she "was aware that Houghtailing had applied to the mortgagee for a loan of $5,000 on the lands she had sold to him and there was no reason she knew of why he could not give a good and valid mortgage on the property."    She, however, would not sign and swear to the paper until Houghtailing had read it and given her permission to sign it, she having promised him to sign no paper without his consent.    Eliza was married on the 29th October of the same year and began this suit in June of the following year (1897).    The above recited facts are uncontradicted.

The grounds urged by plaintiff for setting aside the deed are (1) undue influence, (2) fear, compulsion and duress, and (3) want of consideration.    The defendant urges that the plaintiff had been of age for three years when the deed was given and the presumption is that the influence of her guardian over her had ceased.    Exercise of duress at the execution of the deed is denied by the guardian and supported negatively by the testimony of those who witnessed the execution of the deed; and as to want of consideration defendant contends that the ward's debt to him was equal to the value of the land.

The deed of Eliza to Houghtailing cannot stand.    The transaction is violative of well settled principles of law.    Houghtailing was her guardian.    She lived with his family and he treated her kindly as his own child, calling her his adopted daughter and she was obedient to him.    After becoming of age she continued to live at his house and was so completely under his influence that she would not sign the affidavit sustaining her deed until Houghtailing had approved of it.    There was no disagreement between them except on the subject of her marriage.    He expressed his disapproval of it, not liking her proposed husband, and she postponed the marriage for six months to please her guardian.    His disapproval of the marriage does not seem to have been serious for the pair were married at Houghtailing's mother's house and he furnished the wedding outfit. But meanwhile Houghtailing had got the deed from her, and from his own statement that he said to her, "Before the deed was made I asked her, Eliza you are marrying against my consent, this property stands indebted to me so much. I didn't bother myself about it until you are marrying against my will; I must have something with it to secure me this property; now I had to go to work and raise it myself to hold it.   I said, Eliza, what will you do, will you marry or will you consent to do what I ask you to do?   I explained the matter right there," it may be inferred that he gave her the alternative either to make the deed he had asked her to make and marry with his consent or to decline to make the deed.    Whether she knew that Hough-

tailing's consent was essential to enable her to marry does not appear, but the presumption is that she thought so. At any rate he consented to the marriage when he had procured the deed. Whether her consent to the deed was obtained by these means or not, it should be avoided, because the parties were not in these dealings at "arm's length." Her guardian had not informed her of the amount he claimed she owed him, nor the value of the land. She had had no independent advice. She had never been put in possession of her property. Her guardian continued to act in the fiduciary capacity long after it had ended in law.

Courts of equity closely scrutinize dealings between guardians and wards and they are presumed to be voidable on the ground of undue influence if they took place while the influence and dominion lasted. Prima facie such deeds are voidable and emancipation from the influence must be shown by the guardian who has the burden of proof. It is true, that it has been held by some courts that, in the absence of evidence, undue influence lasts one year after the termination of the fiduciary relation, but it may be proved to last longer. Bispham, in his Eq., Sec. 234, says, to sustain settlements between guardian and ward "it must appear that the ward had sufficient time and opportunity to examine the accounts and that he was either himself competent to make the examination or was assisted by competent and independent advice." If the ward has not been put in possession of the estate courts will watch the transaction with a jealous eye, id. These principles apply with the same force to gifts from a ward to a guardian, sales between them, releases, &c., and contracts generally. There must be a full disclosure on the part of the guardian and thorough understanding and free agency on that of the ward. 27 Amer. & Eng. Encyc. Law, p. 492, and cases cited.

The defendant contends that his expenditures for the ward over and above the income of the estate would show a large balance in his favor over the value of the estate. This is not the proper Court to consider these questions. He should have presented them to the Probate Court.

The plaintiff was still under defendant's influence when she made the deed; she acted without an adequate knowledge of the facts and without advice and it would be contrary to equity and good conscience to allow the deed to stand.

The decree appealed from is sustained.

*Kinney & Ballou* for plaintiff.

*C. Creighton* for defendant.